What? Okay. Thank you. Okay. All right. Let's just make sure. Microphone's okay? Okay. Mr. Ford. Okay. Good morning, Your Honors. Matthew Ford on behalf of Defendant Aaron Gov. May it please the Court. The lower court below has issued a $7.4 million judgment against my client. $5.8 million in disgorgement. Another million in prejudgment interest. $621,000 in Tier 3 penalties based on a no-admit, no-deny settlement with the SEC. This judgment needs to be vacated. It needs to be remanded. Let's start with the remand. The SEC agrees. Whatever happened down below, it makes a hash of the changes that we've seen over disgorgement law over the past decade or so now. The Court incorrectly applied the 2021 amendments. It incorrectly applied COCESH, and it incorrectly applied LIU. Now, what we can gather from the decision is that the disgorgement award was issued pursuant to 18 U.S.C. I'm sorry, 15 U.S.C. 78 U.D. 5. That provision authorizes the SEC to seek and the Court to award equitable remedies that are appropriate and necessary for the benefit of investors. The Court gets it wrong in three ways under this provision. First, it fails to identify the investors who are readily identifiable as the SEC concedes. It fails to identify a legally cognizable harm that would make them victims entitled to equitable restitution or disgorgement. Well, the district court identifies a harm, which is that they were defrauded, right? Your point is that that doesn't entitle them to restitution because they don't suffer a financial loss. That's exactly right. And to put a gloss on that, in order for the remedy to be equitable, it cannot exceed. We know that under COCESH and LIU, it cannot exceed the actual harm. Any compensation that goes beyond that harm would convert it into a penalty. What the court actually does down below, and this is something we should be very concerned about, is it takes sort of what I think goes back to at least 1985, but let's start with 2004 with Tooley. It takes these corporate law concepts that are so well entrenched, adopted obviously by Udell and Serino in the first department. Okay, but Congress has added to the statute D7, right, which authorizes disgorgement. That's true. So the district court doesn't specify which provision it's operating under. The SEC cited both D5 and D7, right? So isn't an order of disgorgement authorized under D7? It is. Regardless of whether the investors suffered a—well, maybe that's a question. Regardless of whether they suffered a financial harm. Yeah, well, under D7, what we have is this new statute that authorizes disgorgement that permits it to sort of claw back unjust enrichment by which the defendant was unjustly enriched through the violation. Now, without getting into whether that's an equitable or legal remedy, what I will say is we should be guided, and I think this court now has the opportunity to provide some guidance as to what that means. Keep in mind the legislature had the opportunity to say ill-gotten gains, illicit retention of profits. It chose to use an equitable formula, unjust enrichment, which as we know is really a situation where a plaintiff— But also this is the term disgorgement, right, which is the term that all of the courts were using before Lew and that Lew pared back. So shouldn't we understand it as sort of restoring the remedy that courts had recognized prior to Lew called disgorgement? But then it provides a definition. So while you're right that D7 authorizes the SEC to seek and the court to award disgorgement, if you look at D3, that provides a definition of disgorgement. There really are two different kinds of disgorgement. One is clawing back ill-gotten gains, and then the other is the harm to the investors. And you're saying that depending on which one, you need certain findings and the district court didn't specify and didn't make the requisite findings. I think that's exactly correct, Your Honor. And if we go back— But if we're operating under D7 and if we're operating under the way courts regarded disgorgement before Lew, they wouldn't need to make a finding about harm to investors, right? Because before Lew, we had courts that were awarding disgorgement where the money went to the treasury. That's true, and we now know that that process is not permitted. And if we go back— Well, it's not permitted under D5 because D5 invokes equity. But I guess my question is why shouldn't I read D7 as just saying the traditional disgorgement remedy that courts had developed before Congress is restoring that? Well, there's two things. We're not opposed to transporting some of the prior sort of common law that developed when it was an equitable judicial remedy into D7. But bear in mind that D3 provides a definition of disgorgement, and that definition is that it's unjust enrichment. So we really should look at those traditional principles. Again, the court—I'm sorry, the legislature chose to use unjust enrichment as the formulation rather than saying illicit gains, ill-gotten— But how does that modify the traditional disgorgement remedy by using that term? Well, the facts of this case explain exactly why that happens because in order to have unjust enrichment, you have a plaintiff confers a benefit, the defendant retains it, and then we look at equity and say, hey, we should give it back. The problem is here we have a classic misappropriation scheme whereby the public corporation was allegedly harmed. And what happened is several months, half a year prior to the SEC action, the company actually entered into a settlement agreement with Mr. Goethal whereby he relinquished the value of the retained gain on adjustment houses. But your argument is that it should be properly discounted by the value that he transferred back to the company, right? That's exactly right. So it's not that it's improper to have this kind of order of disgorgement. You just think that the district court miscalculated by discounting the value of the stock that he transferred back. No, I think the court below never considered it. That's our problem. And to go back to what Judge Chinson— Sorry, never considered what? It never considered whether or not to discount the $5.8 million that he relinquished. Was there a refining as to the value of the stock that he gave back? There was never a refining as to the value of the stock. You'll see there's just a single footnote in the decision. Yeah, but we can take judicial notice of publicly traded stock prices at closing, right? Yeah. I mean, your whole argument presupposes, I think, that there's some difference between the victim's losses and your client's unjust enrichment. And it looks to me, from everything you see, in the facts not disputed and in Judge Etkin's order, like this company was essentially operated as the family's private piggy bank. And so even to the extent he's giving his shares back to the company treasury, if the company is being operated as a sham, how is he entitled to that value? Let me make two points. One, to distinguish us from the last case. We're talking about a public company with revenue of $80 to $100 billion a year. So to say it's a piggy bank, that there's an allegation that $7 million is misappropriated, is inaccurate in the first instance. But we're not talking about investors who are harmed as purchasers of public stock. There's three private authors. So we're giving the stock back at a moment when, correct me if I'm wrong, the market has not yet been apprised of all these, or the market is already on notice of the SEC's allegations and that value still exists? The harmed investors here are not general investors in the public. There's three private offerings we're talking about, the first are two convertible notes. Now, if you look what happened with those first two convertible notes, they give the money. After six months, the notes are converted into common stock, right? And those individual investors get the common stock at a very discounted price from the public trading price. So the second they transfer to them, they've already made a huge unrealized profit from what we understand. They then sell them. One of them makes $450,000. The other makes $900,000. Is that your argument? They weren't harmed. They actually made money. The value they realized when they sold the shares should have been netted from the— It shouldn't have been netted. What I'm saying is it takes it out of the realm of D5. That's the argument that the investors are not victims because they did not suffer a financial harm. But if we're in the world of D7 and if we think that it's the kind of disgorgement that could be ordered before, then maybe the court could order disgorgement to the company. In fact, the court does discount the amount of disgorgement by the amount that Goville is going to transfer under the promissory note to the company, right? That's correct. So he is discounting it by some of the value that's going back to the company. So if he had included the value of the stock, whatever that value is, would you have an objection to the disgorgement order? The answer is no. So really—so the question is not that the district court made an error in ordering disgorgement. The question is whether the district court made an error in not discounting the amount of disgorgement by the value of the stock. We don't—I don't think it's a factual question. Judge Etkin down below, he never reached it, so it's not a factual issue. It's caused by an error in his legal analysis. What he found was the investors suffered the harm caused by the misappropriation, which we know is not correct under corporate law. So it kicks us into D7. I think you're right. If you look at what Judge Etkin says, and he acknowledges—and I'll quote, he says, after all, if Semtrex was the victim, then the settlement agreement would have amount to fair compensation. So Etkin himself acknowledges it in the order but then never considers it. Well, the settlement doesn't necessarily have to amount to fair compensation. I mean I guess there are these questions about the valuation of the stock. I mean if he made a factual finding that the valuation was inaccurate, he could order some additional disgorgement, couldn't he? Yes. In fact, the settlement was for $7.1 million, and the complaint here says it was 7.3. And so you don't dispute that he could order additional disgorgement. So if he were to find that actually the stock was improperly valued as part of the settlement agreement, it actually has a different kind of value, then maybe that would be okay to order additional disgorgement. You just think he erred in giving it a value of zero. That's the outcome we anticipate, which is if it's vacated and once we go down on remand, I do think we're going to have to have a sort of damages inquest. We're going to have to do two things. I think the first we're going to get rid of quickly. The first thing we're going to have to do is look under D5 whether these very specific investors that participated in private offerings were harmed. We're going to find out very quickly because we already know in the record that they made money. That's going to knock it out. We sort of mentioned that in the brief. It's going to kick us over to D7, and we're going to need to do a damages inquest. Now, we think our evaluations are bulletproof and they're going to stand, but we do recognize the SEC is going to get the opportunity down below in an inquest to determine if maybe the value is lower. But one thing we can say for sure about the value of those shares is that he was content. I mean, Judge Epkin seems to say on page 4 of his order, your client gives the shares back to the company. He gets a release in return that that's an even exchange, and so he's not really disgorging anything. He's exchanging one form of value for another. Well, under D5 analysis, that's correct. But under D7, we're looking at unjust enrichment principles. We have to ask did he retain the benefit, and the answer is if he relinquished the value of $5.8 million in stock, then he did not retain that benefit. We're not talking about a situation. But you're saying the release from the company is worthless? No, it's valued at $5.8 million, and we think that there's – remember – Right, so he exchanges one form of $5.8 million for another form of $5.8 million, and therefore he's given nothing back. And whatever he's unjustly enriched himself with prior, he remains unjustly enriched with. I think it's a compelling question, and the answer is we're looking at unjust enrichment principles, which functions only vis-a-vis the party who conferred the benefit and the party who retained it. In this case, it's Semtrex, the public company that conferred the benefit, and it's Mr. Goebbels himself that then returns it back to Semtrex. In other words, if we look at this in standard equitable terms, we have a wheel off kilter because Semtrex lost $5.8 million, let's say, or $7.1. As soon as that $7.1 is returned to the company, the wheel is back on kilter. Equity doesn't weigh in. All we're doing is penalizing. The reason that Goebbels was purchasing the release of claims is that they released the claims because they thought he had made restitution to the company. That is exactly correct. So once we get that wheel back in kilter, we're now in the territory of punishment. In fact, we've said in cases that when you make payments pursuant to the settlement agreement, it satisfies a disgorgement. It's discounted from the amount of disgorgement, right? Yeah, and this Court has said that, and the SEC has actually recognized that. There's a footnote laid in there. In fact, Judge Edkin says that he's going to discount the amount of disgorgement by the money that's transferred pursuant to the agreement between Goebbels and Centrix, right? That is true. So the excluding of the stock is only based on the idea that the stock doesn't have value? Yes. Well, no, that's actually not Edkin's analysis. What his analysis is based on is the misconception of corporate law. What he says is that the victims, that the investors were victims because they thought the company was going to use the money for something different than they did, and then it got misappropriated. What he's saying is that because the promissory note infuses the money back into the cash, the investors get the benefit of the bargain, but with the transfer of stock, it doesn't infuse the money, so that's why they don't have the benefit of the bargain. But as we know, under corporate law concepts, this completely flips things on their head. They got the benefit of the bargain. They entered into – they purchased a convertible note. The note was converted. They got the common shares, and at the end of the day, they get everything they bargained for. Can I just ask again? They said that they were harmed by the money not being spent on the company. Returning the money to the company would also redress that harm, even if you regarded that as a separate harm. I'm sorry. I missed the first part of it. So if you regarded the investors as being harmed by not having the money spent on the company and spent on those personal expenses and so on, if the money is returned to the company, that would also redress the purported harm to the investors, right? That's exactly right, and that's the way that we run derivative actions, right? A plaintiff is not – or an investor is not allowed to bring these claims directly because we've determined they've not been directly – to show they were directly – So can I ask why the stock has a value? So I guess for the Series 1 preferred shares, they're traded on the market, right? So we have value for those. For the Series A and Series C, Gobo could have sold those to somebody else, right? Some of the preferred shares were – some of them were non-transferable. The CETXP, you're correct, those traded on NASDAQ, and so they had a public value. Some of the preferred shares, what they did is they were – one, it was an entitlement to a dividend, so they had value to the company in that they didn't have to pay the dividend. There was the fact that the shares are retired, which reduces the overall amount of the preferred shares, which alters the voting rights structure, and we know from Google. So it has value to Gobo because he is getting some benefit from it. It has value to the company because retiring them saves them some amount of money. It also – So it's a good thing that there's a non-zero amount of money, but we don't know on this record what the actual value is. I guess in the settlement, they were valued at $5.3 billion. That's correct. But it would be open to the court to dispute that, right? Yeah, and so it's not a factual issue, but like I said, when we send it back down for damages in Quest, what we will do is we're going to have this factual record developed. The truth is I just don't have it before the court. We stand by our $5.8 million valuation, but the SEC was never given an actual opportunity to challenge it, and Judge Etkin never made a ruling on it. So if we come back down and we find that the shares were only worth $0.02, then we'll subtract $0.02 from the disgorgement amount, but I think we're talking about a much more substantial number, which is why we're here before you today. I think it's going to be indisputable that the value of these shares is in the millions of dollars. Okay, thank you very much, Mr. Ford. You have some time for rebuttal, but we'll turn to the government. Ms. Dingell. Good morning, Your Honor. It may please the court. I'm Carrie Dingell on behalf of the Securities and Exchange Commission. I think my friend's argument misses a central point, which is that the shares were transferred back to the company and then canceled, and the effect of that was to transfer control of the company to Mr. Goebel's son. And so that was the benefit to Mr. Goebel from the transfer. Elsewhere in the securities laws— But why does that matter? I mean, the money is going back—I mean, it is something of value that goes back to the company, right? Because this was essentially a gift to his son. The company didn't resell the shares. There's no— But if the preferred stock creates an obligation to pay some specified dividend to the holder and those shares get canceled, that cash that would have gone to pay the dividends is now in the company's coffers and presumably affecting the value of the publicly traded shares as well, no? It's possible, Your Honor. That argument was not presented to the district court. So the district court used the framework that this court has always used to determine the appropriate amount of disgorgement, starting with a reasonable approximation of the defendant's unjust enrichment, which is the appropriate measure of disgorgement regardless of the statutory provision that we're proceeding under. Well, has the traditional framework changed in light of the amendments? It has not, Your Honor. This court has not addressed the framework post the amendments, but it did address the framework post Lew and found that it was the same, which is that the commission starts with a reasonable approximation of the amount of unjust enrichment, which in this case is the amount that Goebbels personally stole from the company. The parties agree the case has to be remanded? The commission believes that the case only needs to be remanded for the narrow purpose of saying that any amount collected in disgorgement will go into a fair bond. And you agree that the district court didn't specify which provision he was relying on? Yes, Your Honor, but it doesn't matter because the disgorgement— And what is the harm in remanding and asking him to specify? There may or may not be differences depending on which provision the district court proceeds on, and it seems like there are some questions as to the value of the shares that was returned, including the canceling of the dividends. I mean, what is the harm in letting the district court just take another look at it? I don't think that there's harm in doing so, but I think that the district court has already done that. The district court took a close look at the settlement— Did the district court consider the issue of whether dividends were being canceled for the returned shares? Your Honor, the district court considered whether there was value, whether the amount of value of the shares— Did the district court consider the issue of the canceled dividends, the canceled shares, and therefore the wiping out of dividends? No, Your Honor, because Mr. Goebel did not— Do we have any idea what that—how much that would be? Mr. Goebel did not present any evidence of that to the district court, and it was his burden to do so under this burden-shifting framework for how we determine disgorgement. But Mr. Goebel did maintain that the shares had value, right? Mr. Goebel maintained that the shares had value. There were three classes— And didn't he just acknowledge that the shares had value? You said it has some value to the company because it cancels the dividends. Well, the value in the shares—and you can see this from the valuation—that there was a control premium on the two— Right, so that has some value. Well, the problem is— Before we even get to that, what about the Series 1 preferred shares? Those are traded on the market, right? So those have value? They also traded on the market. Those are the only shares that traded on the market, but those— Okay, so even just focusing on that, I mean, the district court did not discount the disgorgement order by the value of the Series 1 preferred shares either, right? So if they're an asset that's traded on the open market, it has value, right? And so if he gives that back to the company, why should that be treated differently than the cash he gives back to the company? Your Honor, because Mr. Goebel did not present that argument to the district court. Mr. Goebel said that the entire settlement value should be deducted. It was his burden to show what the value was. Okay, so put aside the question of waiver. Let's assume all the arguments are preserved. Should the disgorgement order be offset by the value of stock that's transferred from Goebel to the company? It's an interesting question. I think that if Mr. Goebel could show that there was value other than this transfer in control that was essentially a gift from Mr. Goebel to his son— Well, so I understand the Series A and C maybe are more complicated, but what about the Series 1 preferred shares? So obviously there's value if they're traded on the market, right? It's an asset that other people buy. Yes, Your Honor. They do have increased voting rights as compared to common stock, so it's a little bit more complicated with respect to that class of stock. But for the Series A and Series C shares, the valuation includes a control premium. So this is an acknowledgment that the value in the shares is that they confer control of the company. By transferring them back to the company and having— So there's a control premium plus there's a dividend payment, right? I believe—yes, Your Honor. Right, okay. So the holder of the shares gets a control premium plus a dividend payment, and if you send it back to the company, the company at a minimum retains more control and also doesn't have to pay out the dividends, right? Yes, Your Honor. So there's some value to that, is there not? There could be some value. It's a nonzero value. Maybe it's very little. I don't know, but there's some value to that, right? There could be some value. So why would it be the case that the disgorgement order needs to be reduced by the amount of cash he sends back but not the amount of assets that have value that he sends back to the company? Well, Your Honor, the district court was proceeding on the record that it had, and this court reviews that for an abuse of discretion. The district court did not have the evidence before it to sort of parse out the value to Mr. Goebel of transferring control of the company to his son from the sort of cash value to the company of the shares that would ultimately benefit investors. So the district court took a close look at this— I mean, the son is an officer in the company, right? I mean, he's dealing with him in his capacity as an officer of the company. It's not that he's just making a private gift to his son. Well, Your Honor, I think the district court disagrees with that. And if you look at the way that the settlement occurred, you can understand why the district court was somewhat dubious that there might have been some self-dealing with the settlement because it happened in the course of the SEC's investigation into Mr. Goebel's— I understand, but you just acknowledged that the stock transfers have some value, right? So, I mean, I think the other side is acknowledging you don't need to just accept their valuation of the stock, but you could argue about the value of it, but shouldn't there be some value assigned to it when deciding the amount of disgorgement? It's possible the district court found that there was no value, that the only value was in transferring control. Yes, I understand. That's what the district court said, but you just acknowledged here that it has some value. It could have some value, yes. I think that argument— So does that mean the district court was wrong? No, Your Honor, because that argument wasn't— Okay, so it's only a bad waiver. It's not that the district court was right. It's that just there was no argument presented to it that said that the stock had value. It's about the fact that this court is reviewing the district court's order for an abuse of discretion, and the district court did the best that it could given the record that was before it. Can I just ask again, at the moment this settlement is executed and the shares go back to the company, is the public on notice about the SEC allegations yet or not yet? I don't believe so. It was in the course of the investigation, and I don't believe the settlement referenced the SEC investigation. So the value of the shares would have to take into account whatever diminution in value the knowledge that this company is the subject of a serious SEC investigation would imply? Yes, Your Honor, and that's another problem with the valuation is that there's—Mr. Goble did not inform the independent appraiser that he had committed numerous violations of the securities laws, including a pump-and-dump scheme that seriously affected the share price. Yeah. Do you—sorry. Go ahead. Do you accept that the investors—do you agree the investors didn't suffer a financial harm? No, Your Honor, and I don't think that that's supported by the record. The district court found that the investors were harmed. Mr. Goble— Well, the district court said that the investors were harmed by the money going somewhere other than they intended, right? But they made the investment in the company at the strike price. They profited. The district court says they may have not suffered a financial harm. I guess it doesn't say so explicitly, but it acknowledges that it seems possible, maybe likely, that they didn't suffer financial harm, right? They may have ultimately made money on their investments. Could they have made even more money on their investments had Mr. Goble not stolen $7.3 million? I think that's possible too, so I think it's impossible at this point. Well, if in fact most of the investors—and if they're identifiable, this would not be a hard question to answer. If they just sold the shares at the strike price, then even if the company could have done much better, they still would have just made the same amount of money, right? It wouldn't have made a difference actually if there was more money in the company that made it perform even better. It's possible, Your Honor, but what I would say is that the calculation of precise pecuniary harm to the investors will occur at the next stage. So the way that this works is that the commission will collect all of the money and penalties and disgorgement that's awarded, and then it creates a distribution plan that the district court retains jurisdiction over. And in the course of the distribution plan, there might be some more sort of discovery into the particular pecuniary harm suffered by the investors who— there were victims of Mr. Goble's other securities law violations as well. So there's potentially a large pool of investors who were harmed, and the money will go into the distribution plan. The commission recommends a fair allocation of that money, and then the district— Not necessarily, Your Honor. That is— So you're accepting the principle that money only goes back if there's a pecuniary harm. They should not be entitled to money otherwise. So a disgorgement remedy. In general, that is the way— At least a D-5 engorgement remedy. In general, that's the way that the distribution plan works, but that happens at a later stage. And that does not affect the calculation of the disgorgement amount, which disgorgement under any provision— Your Honor, you acknowledge that when an investor doesn't suffer financial harm, they don't get a disgorgement remedy. Doesn't that go to the question of whether they're victims in the first place and whether you can proceed under a D-5? No, Your Honor, because the disgorgement remedy is not for investors. It's measured by— Statute says for the benefit of investors. Yes, that's an additional statutory gloss on what needs to happen to the money once it's allotted. It's not a gloss. It's in the statute, right? Yes, but the calculation of disgorgement is either under lieu, under D-5, under D-7. It's always measured by the defendant's unjust enrichment, even if that amount differs from the amount of harm by the victims. Right, but— You're saying it's irrelevant whether the investors actually suffered financial harm? For the purposes of calculating disgorgement, yes. That is relevant— What about the equitable remedy? That is relevant to the secondary analysis of where the money goes once it's collected. So if you take all this money and it turns out that the investors didn't suffer a pecuniary loss, where would the money go? The Treasury? It's possible. I think at that point the commission would file a motion saying where it thought the money should go. Under equitable principles, it could go to Treasury under the principle that it's— Well, under lieu, it can't go to the Treasury, right? No— We're proceeding under D-5. Even under D-5, the Supreme Court merely said that in general money should be distributed to harmed investors over being sent to the Treasury. But it said that lower courts could determine what was appropriate to happen if it found that it would be infeasible to do so. Do you think D-5 and D-7 authorized the same remedy? A very similar remedy with the exception that D-7 removes the additional statutory loss that the remedy needs to be for the benefit of investors. So I think it provides additional flexibility for the commission— You mean that under D-7 maybe it can go to the Treasury? I think under either provision it could go to the Treasury, but under D— You think it should go under D? Yes, under D-7 I think there's more flexibility. But given the interpretation that suggests that maybe under D-5 it should go to investors, under D-7 it would not necessarily have to do that. Yes, Your Honor. That's a fair way to look at it. Why are there two provisions? I mean there are two provisions. There are different statutes of limitations. Well, you have to sort of go back to the history of how the provisions developed, I think. But you're saying that there's essentially no difference between the two, and that runs counter to the general thought that we don't read provisions to be meaningless. I think D-7 largely codifies Leu with the change that the remedy no longer needs to be for the benefit of investors. But you think D-7 codifies Leu? Isn't D-7 a response to Leu? I think D-7 largely codifies Leu to the extent that it says that disgorgement is a remedy that's appropriate in commission actions, and that it's measured by the defendant's unjust— But when you said disgorgement, it wasn't a remedy that was appropriate in equitable actions. It just said that there's some equitable limitations on the scope of it, right? Yes. That was the holding of Leu. So I don't know. Tell me why this is mistaken. So courts are granting disgorgement under the general provision for equitable remedies. The Supreme Court says, well, you're going beyond equity, so it pairs back the remedy somewhat. And then Congress comes along and says, actually, we're going to explicitly authorize a disgorgement remedy. Why shouldn't I understand that as Congress restoring the pre-Leu remedy? And then so the Leu limitations apply to D-5, but D-7 enacts the pre-Leu disgorgement notion. I think that D-7 does that with the – with respect to the specific that money needs to be given to investors limitation. So you're saying Congress said, OK, D-5 covers everything we want, but we just want to have a separate provision that doesn't require it to go to investors? Yes, Your Honor. Why did they just delete the for the benefit of investors from D-5? Because it also establishes a statute of limitations for disgorgement remedies that's different from the 2462 statute of limitations that the Supreme Court had held in code. Yeah, but if the difference between the two is so minor, as you suggest, why would there be two different statutes of limitations? Well, the 2465 statute of limitations was five years, and so I think Congress wanted to expand that to 10 years for certain types of claims, including those involving Cyanter. And in order to do so, because disgorgement still wasn't expressly in the statute, needed to codify Leu to expressly say disgorgement's allowed, here's the statute of limitations, and omit that for the benefit of investors language that had been an additional gloss on the D-5 disgorgement. But there's no reason to think that Congress was sort of creating a wholly distinct and new remedy that was completely divorced from what the Supreme Court has in place. Well, it uses this word disgorgement, right, which is the word that the courts used before Leu, right? Yes, Your Honor. And then Leu, the Supreme Court says, well, disgorgement is actually not a thing that courts did in equity. But it's sort of like other equitable remedies, and so we're going to put some limitations on it to make it kind of resemble equitable remedies. But then Congress comes along and says, actually, we like disgorgement, right? Yes, Your Honor, I think that's a fair way to read it. So if Congress is using a term of art, doesn't it carry with it the way the courts defined it? Well, Your Honor, I think it depends on how you read Leu. I think Leu largely vindicated the way that the disgorgement remedy had been used over the decades, going back to the 70s, with a few minor exceptions. And so Leu was not that big of a change to disgorgement from what came before it. And the amendments made — Well, can I just ask this? I mean, the Fifth Circuit does not think that, right? They think that D-5 and D-7 are different, right? Yes, Your Honor. So if we adopted your interpretation of D-5 and D-7, it would create a circuit split with the Fifth Circuit? Well, I don't think it's necessary to do so in this case, and I think that this issue will come before the court in a case where the commission is asking to send funds to Treasury. The commission is not asking to send funds to Treasury here, so this is not the appropriate case. But it probably will, right? Because you just said that if it turns out that the investors are not financially harmed, you're not going to send money back to them, right? And we know that a lot of investors here were probably not financially harmed, so probably the money is going to end up going to Treasury. I don't think — I think — I mean, the court found that it's possible that the investors weren't harmed, but all it cited for that was Mr. Goebel's own declaration. So I don't think that there's any reason to believe that there's not financial harm here, that the money won't be able to be distributed. Okay. Thank you. Thank you very much, Ms. Dingell. We'll hear back from Mr. Ford on rebuttal. How do you respond to the waiver argument that you didn't make these arguments with respect to value of the return stock in the district court? It's in the record, A312. It was attached as Exhibit 3 to the opposition to the SEC's motion down below. And the court even says in a footnote that it declines to address the SEC's argument that the valuation of the preferred stock is not credible. So I don't think there's any doubt that the entire proceeding down below, which we were not part of, is represented by different counsel. But the entire proceeding below was about this, although it was eventually never ruled on. The court passed on ruling on it. So that's — I don't think the waiver issue comes into play. There's two very important things I want to clarify. The first has to do with understanding Lew. The second, I think, is absolutely essential to correct the SEC's misunderstanding about the way the payments are made. So let me do the Lew part first. The SEC's interpretation rests on the notion that Justice Sotomayor somehow changed her mind in the three years between Kokesh when she wrote a 9-0 opinion and Lew when she wrote an 8-1 opinion. She did not change her mind. In fact, if you look at Lew closely, it sets part a two-part test, not the one-part test that the SEC advocates. They advocate a test that says disgorgement award does not exceed a wrongdoer's net profit. Well, yeah, that goes without saying. That's what the word disgorgement — that's what disgorge means, right? But there's a second part to Lew. It says the disgorgement is awarded for victims but not in an amount more than a fair compensation to the person wronged, and those are not accidental words. That is Justice Sotomayor referring us back to Kokesh, which sets forth the actual standard for when disgorgement is equitable or punitive. We know it's punitive if it's imposed for a consequence of violating public law, one, and two, if it's imposed for punitive purposes, deterrence and retribution. And what the court goes on to say is that anything that goes beyond, anything that goes beyond compensation, that becomes a penalty. So if it goes over by a penny, that penny is a penalty. We have — that is part of a two-part Lew test, right? They're right that we measure it by what the defendant gained, but when we award it in an equitable way, it cannot exceed the mark of the test. So what about this argument that that's something to be reserved for the distribution plan? I'm sorry. What about the idea that the SEC brought up that that's something to be reserved for the distribution plan, that then they'll find out the extent of the harm and then decide where to distribute the funds? Well, this is not an administrative proceeding. This is a proceeding before a federal court, and as the statute very clearly may explain, the SEC may seek this award, but it's the court that awards it. We think the court should be in charge of the award and monitoring it. Now, there's a — this bleeds into the second piece regarding what happens with the money. Let's start with D7 disgorgement that might arise. It's already provided for by Congress in statute. If we look back at 78UD3C1 — I hope I got that right — it already says that if there's a penalty, the money goes to the Treasury. It carves out two exceptions. One is 15 U.S.C. 7246. Now, that is the fair fund that the SEC is referring to. They're allowed to use it in administrative proceedings. In a court proceeding, they're required to make a motion before the court to create the fund to distribute the penalties to victims. There's another provision, 15 U.S.C. 78U-6, which creates a whistleblower payments. That's what the SEC has been doing with a lot of its disgorgement money we come to find out. In fact, just I think a month ago, there was — they gave $289 million to a whistleblower instead of to the investors as they're supposed to get it, according to the Supreme Court. Has the amount of the promissory note been paid now? To be truthful, I'm not entirely sure of the status of the — If this case gets remanded, is that on the table also? So your client got credit dollar for dollar for a promissory note that he may or may not have made good on. Can the district judge on remand reevaluate the question of whether to credit dollar for dollar this promissory note? This goes back to unjust enrichment principles if we're operating under D-7. The question is whether the benefit was conferred to Mr. Govill and then whether he relinquished it. So if we go back down and we need to answer that question, that's a question we'll answer whether he relinquished it. Meaning that that is in play. Yes. And I just want to fill in — I didn't get your punchline on the second point you were making about the misunderstanding about the way the payments are made. So exactly. So the statute already says that if it's a penalty, it's got to go to the Treasury. We know how that operates unless, like I said, there's those two exceptions. Here's the punchline. Under D-5, what the SEC's been doing, we know, has been sending it to the Treasury. It was never authorized by Congress. This is what I would propose. And I understand that this is novel, but I'm going to put it before the court. We should do with this sort of restitution under D-5 what we do — exactly what we do in criminal cases. The court should identify who the victim is. They should identify the amount of money they're entitled to. And it should go to the clerk of court for distribution. I think that's the way we should be dealing with the equitable remedy. As far as I see it, Congress has not authorized the SEC to take hold of an equitable remedy and then to distribute it as it sees fit. As Lou pointed out, maybe a little bit to a whistleblower here, maybe a little funds for the inspector general here. No. If it's equitable remedy, if it's for the benefit of the investors, let's do what we do with restitution in criminal cases. Let's send it to the clerk of court to be distributed properly. That's my proposal on that. All right. Thank you very much, Mr. Ford. Thank you, Your Honors. The case is submitted.